Thank you, Your Honors. My name is David Ness. I'm with the Federal Defenders of Montana, and I represent Mr. Ricky Blackbird. The primary issue in this appeal, as I see it... Mr. Ness, are you going to share time with co-counsel? Yes, Your Honor. I think we are. All right. Keep an eye on the time. Ten minutes total. Sure. The primary issue in this case, as I see it, has to do with the contents of the state, and that is whether or not the government presented sufficient evidence to tie Mr. Blackbird to the methamphetamine in the gun that were found in the safe. There's a lot of evidence of his dealing. Is that not accurate? Your Honor, there certainly was sufficient evidence that he provided some methamphetamine to Patty Dana, who owned the house. Her testimony was, though, that he gave her perhaps, as I read it, a grand total over a two-month period. And then there was also some testimony from his girlfriend that he had distributed some methamphetamine to others in the basement where he and his girlfriend lived. She did say, however, that in very small amounts, and she didn't testify that there was even any money exchanged here. On page 7 of the red brief, it indicates that visitors would meet with Blackbird. Blackbird used a mirror at the bottom of the basement stairs in order to see who was coming. That begins to make you think that he was quite into the business. Well, I mean, but keep in mind, Your Honor, that he was living down in this basement with his girlfriend. It had an open door. He didn't – certainly he – there's no evidence that he locked the door or kept people out of the basement. The evidence was that this mirror was moved at some point to put there by the door. But I don't know that that in and of itself would establish, or even with the other stuff, would establish that he was necessarily dealing. I think it's reasonable to think that if someone's living down – if you're living in a basement with your girlfriend or boyfriend and you can't control access to the basement, that you may want to be able to see who's coming up and down the stairs. Now, did Dana deny that this was her meth? Yes. Uh-huh. Yes.  Although the safe was found in an area of the basement that – with her stuff, so to speak. It was surrounded – it was under these shelves where she kept all of her canning supplies and junk, basically. So at any rate, I think that the two issues with respect to the gun has to do with – well, not only the gun, but the contents of the safe. First of all, his possession and whether or not the government has established beyond a reasonable doubt that Ricky Blackbird was the one who possessed, either actively or constructively, this safe and its contents. In that regard, I think that the Court needs to keep a couple of things in mind. One, he and his girlfriend lived intermittently in this basement. Number two, they really didn't have control over who came up and down through the basement. Number three, Patty Dana admitted that she was involved with other drug dealers. Number four, the safe not only – it not only required a combination, but also a key to open it, and Mr. Blackbird was never found in possession of a key. His fingerprints weren't on the safe or any of the contents. There was a fingerprint found on one of the baggies inside of the safe that wasn't matched to Mr. Blackbird, Patty Dana, or Brooke Bibler, the three people that were involved in this. The other issue has to do with even assuming that the government did, in fact, establish possession, whether or not it proved beyond a reasonable doubt that this gun was possessed in furtherance of a drug trafficking crime. And there I would just respectfully submit that the gun was locked away, albeit with the drugs, but the gun was unloaded. There was no evidence that the gun was ever out or used during an actual drug transaction. We make any inference from the fact that the gun and the drugs were in the same safe? I think that that's a factor that the Court can look at. Honestly, yes. But I don't think that that factor in and of itself carries the date. So if the Court has no other questions, I'll yield. No questions, counsel. Thank you. Good morning, Your Honor. I'm June Lord. I represent Brooke Bibler, who is a codependent with Mr. Blackbird. There were two issues in this case when it was originally filed. One of them was a safety bail. That's been resolved by this Court and Cardenas, Juarez, and several others. Isn't there a jurisdictional issue? Don't we have a waiver of appeal in this case? I'm not sure it's a jurisdictional waiver. It should be a waiver of appeal, but since this is an illegal sentence, I think that waiver should not be honored. Why do you say it's illegal? Because Cardenas says that if she's eligible for the safety bail, then the Court must apply the safety bail. The fact that it did not apply the safety bail means the Court must or the Court can't. It says it must, but that's the way I read Cardenas, that it's mandatory if she meets all the criteria, and she did. There was no question she met all the criteria. This is a situation where she was sentenced below the maximum that would be allowable for the crime, and they did give her consideration because of her testimony for the government. There was a mistake, I think, but I'm not sure that one would classify this as an illegal sentence. Do you have any authority that would suggest that? Well, I think that one of the cases cited by the government said if it's a guideline error, then it's not. It's just a mistake. This wasn't a guideline error. This woman would have been facing 41 to 51 months if the safety bail had been applied. As it was, she got 80 months without that. Well, she could have gotten 120. She could have, yes. She was a very small player in this whole thing, as this Court is probably aware. You know, Counsel, I wanted to ask you about the quotation that supposedly came out of Navarro Batello. It clearly didn't, and I wondered where you got it and why it was included or why you didn't point out to us that it was an erroneous quote. This quote is right according to my Lexis document. In fact, we were just comparing it. In Lexis, it says that when the sentence imposed is not in accordance with the negotiated agreement or other sentencing error occurs. Now, in the Westlaw version, it doesn't have that. But in the version I have, which is Lexis, it says that. That's odd, isn't it? I know it is. It's strange. But I think the other circuits have also recognized that if it is a sentencing error of this magnitude, and I think this is a big sentencing error because of the difference between 80 months and 51, that these appeal waivers shouldn't be allowed. The real issue for us then is, although there was certainly an error in retrospect because of the subsequent case, but is it illegal? I guess that's the thing we have to really focus on. But the other circuit cases I cited, it does put that exception, and the Ninth Circuit has made those exceptions also. So that's one exception to that, is if it is not a legal sentence. What was this issue raised before Judge Haddon? About the waiver? No. No, the sentence. The sentence wasn't waived because he was very adamant that the safety valve couldn't apply. And we did object to that. All right. You think you preserved that. That's fine. But I think it would be clear error even if I hadn't. He actually called for supplemental briefing. It's rather odd. And both of them said that it was not mandatory. And then he went on to decide that, yeah, it wasn't mandatory, so he didn't have to follow it. Thank you. Nothing further. Thank you very much, counsel. We'll hear from the government. Good morning. My name is Joe Thagard. I'm an assistant U.S. attorney from Great Falls. I represent the government. With respect to Mr. Blackbird, with respect to the sufficiency of the evidence and that the facts are before the court, I would point out that Patty Dana testified that there was a lot of foot traffic going back and forth between this basement and that she felt that drug trafficking was taking place down there. In addition to the testimony of Dana and Bibler that they either received drugs from Blackbird or saw him provide those to others, there was also methamphetamine found in the basement in what was described as the living area where the defendant and Ms. Bibler were living. There was methamphetamine there, and there were also scales in plain view which could be used for drug trafficking. And I think, again, that bolsters the position of the government that Mr. Blackbird was in a position that he knew what was in that safe and was, in fact, in possession of it. Now, with respect to the firearm in the safe, again, I think that the facts speak pretty clearly for themselves. There was a substantial amount of money in that safe, over $3,000. This relatively pure methamphetamine, I think it was estimated to be worth about $12,000 and a firearm. And while that firearm was unloaded, I think given the full facts and circumstances of the case, that certainly it was used in furtherance of the drug trafficking operation. And I would point out that Dana testified that Mr. Blackbird was very concerned about the security, and that's why he had this mirror at the bottom of the basement, and it's also why he would essentially approve who would come and go from that basement. When customers came to the back door of the house, she'd answer it, and then he would either give a yea or a nay as to whether or not they were going to enter that basement. Unless the panel has any questions on Blackbird, I'll turn to Bibler. No questions, counsel. Thank you very much. The case just argued will be submitted for decision. Can I ask him about the other case? Oh, sorry. Bibler? Certainly. Yes. Do you agree that the Bibler sentence was an illegal sentence? No, I don't, Your Honor. I think that it was a sentencing error. It was erroneous, right? Pardon? It was an erroneous sentence. Yeah. But that doesn't mean it's illegal? I don't think so, Your Honor. Illegality suggests to me to be something like beyond the maximum sentence. You know, I think it was simply a sentencing error. And as we pointed out, ultimately, we think it's harmless because the court still did come below the mandatory minimum. Maybe not. But he might have gone lower, even lower, if he thought, you know, it applied. Well, but he had that opportunity because once he ---- No, but he made the mistake of saying he thought it did apply. Yes, he did, Your Honor. And our position, however, is that once he relied on the government's 5K to come below that mandatory minimum, he still had, you know, really unfettered discretion to impose any sentence that he felt was appropriate. In this case, he felt that it was 40 months rather than the guideline range which would have applied with the safety valve. All right. Thank you. What do we do with this Navarro-Patello case which says that you aren't bound to your waiver if there was error? Well, Your Honor, I think if we've cited the other cases, and there may ---- I don't want to say that there's a conflict, but I guess my suggestion is when I look at all these other cases, the thrust of the cases is that the very reason somebody would have an appeal waiver is that, you know, because we want a finality of conviction, even though there may be some sort of a flaw in the sentence. But that depends on the language of the waiver, you know. Some waivers are, I mean, pretty concrete. They say something like, well, I waive the right to appeal unless it exceeds the statutory maximum. I mean, that's pretty clear, right? That's correct, Your Honor. All kinds of error there under the guidelines, and you still waive it. But this is not, I'll say, quite as harsh. Yes, yes. And in this case, it simply says if the government files the 5K motion and the court accepts the plea agreement, they waive the right of appeal. It's fairly broad, and I think that it extends to the sentence. There's certainly a fairness issue here, and I would think that the government might wish to say, yeah, there was error here. It wasn't harmless because the judge could very well have applied the safety valve and agreed that it go back. Well, and I think in some circumstances, you might be prompted to do that. In this particular case, I think given these particular facts, in particular that a 5K was filed and the judge really did have discretion to do what he wanted, that under those circumstances, it's not unfair. She got a 40-month reduction on her sentence. The judge could have gone farther down if he wanted to, and he didn't. She still got a reasonable sentence. Is there anything about this particular defendant that would cause you not to agree to remand? Well, you know, in terms of her personal characteristics, you know, Judge, I will concede. She is somebody who has a lot of positive characteristics, and absolutely we felt bound to advocate on her behalf because of what she did. She lived up to her part of the bargain. But setting that aside in terms of the case and the procedural posture of the case and what actually happened, I don't think it's appropriate for a remand. If we sent you to mediation, what would you do? You know, Judge, I think it would, again, be our position that she executed a valid appeal waiver, she received a reasonable sentence, and that under those circumstances, that what she got is a fair sentence. The panel has no further questions. Anything further? No. No further? No further questions from the bench, counsel. Thank you. The case just argued will be submitted for decision.
judges: B. Fletcher, O'scannlain, Tashima